## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KATINA A. ROGERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C. A. No. 16-219-JFB-SRF |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security[1], | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Plaintiff Katina A. Rogers ("Rogers") filed this action on April 1, 2016 against defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration (the "Commissioner"). Rogers seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's June 25, 2014 final decision, denying Rogers' claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381–1383f. The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Currently before the court are Rogers' and the Commissioner's cross-motions for summary judgment. (D.I. 12; D.I. 14) Rogers asks the court to enter an award of benefits. (D.I. 16 at 16) The Commissioner requests the court affirm the ALJ's decision. (D.I. 15 at 18) For the reasons set forth below, the court recommends denying Rogers' motion for summary judgment, and granting the Commissioner's cross-motion for summary judgment.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for former Commissioner Carolyn W. Colvin.

## II. BACKGROUND

### A. Procedural History

Rogers filed a SSI application on July 20, 2011, claiming a disability onset date of May 1, 2010. (Tr. at 224) Her claim was initially denied on May 7, 2012, and denied again after reconsideration on January 31, 2013. (*Id.* at 93–127) Rogers then filed a request for a hearing, which occurred on April 3, 2014. (*Id.* at 47–92) On June 25, 2014, the Administrative Law Judge, Judith A. Showalter (the "ALJ"), issued an unfavorable decision, finding that Rogers was not disabled under the Act. (*Id.* at 30–41) The Appeals Council subsequently denied Rogers' request for review on February 2, 2016, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 1–4) On April 1, 2016, Rogers brought a civil action in this court challenging the ALJ's decision. (D.I. 2) On October 24, 2016, Rogers filed a motion for summary judgment, and on November 18, 2016, the Commissioner filed a cross-motion for summary judgment. (D.I. 12; D.I. 14)

### B. Medical History

#### 1. Health history prior to relevant period

Rogers was born on July 5, 1972, and was thirty-seven years old on her alleged onset date. (Tr. at 93) Rogers is considered a younger person. 20 C.F.R. § 404.1563(e). Rogers is a high school graduate. (*Id.* at 60) Since 1998, Rogers has had past relevant work as a food preparation worker, a grocery store cashier, and as a sanitation worker in a chicken plant. (*Id.* at 87, 185) However, as of 2009, Rogers has not reported any wages earned. (*Id.* at 169–170)

From July 2010 through most of 2011, Rogers went to the emergency room, at least nine times, to seek treatment for various symptoms. (*Id.* at 250–628) Rogers sought treatment for

abdominal pain, nausea, vomiting, and menstrual dysfunction. (*Id.*) In September 2010, Rogers had a total abdominal hysterectomy. (*Id.* at 347)

## 2. Health history during relevant time period

In September 2011, Rogers was diagnosed with severe sepsis[2] by Dr. Preachess Vellah. (*Id.* at 615) Furthermore, in September 2011, Dr. Abraham Scheer noted that Rogers has a history of alcohol and drug abuse. (*Id.* at 625–629) Dr. Scheer further noted that Rogers' family said that she has an addiction to Vicodin. (*Id.* at 626) On September 1, 2011, Rogers had a biopsy of her lungs that showed some buildup of tissue. (*Id.* at 635) On September 13, 2011, Dr. Scott Olweiler questioned whether Rogers may be injecting drugs through her ported catheter that was implanted for her frequent treatment of pancreatitis. (*Id.* at 634) Rogers denied any history of injection drug use. (*Id.* at 637)

On March 21, 2012, Rogers filled out an Adult Function Report. (*Id.* at 208–215) Rogers stated she often stays at home unless she has a doctor's appointment. (*Id.* at 208) She stated she cannot pick up a lot of objects, because of a previous back injury. (*Id.*) Rogers noted that it takes her awhile to get dressed, and it is hard for her to bend over to put her shoes on. (*Id.* at 209) Rogers said her daughter helps her with her hair. (*Id.*) She said her family reminds her to take her medicine. (*Id.* at 210) Rogers said she sometimes prepares her own meals, but prefers not to cook most of the time. (*Id.*) She said she is able to do light dishwashing, and can fold laundry while sitting. (*Id.*) Rogers stated she is able to leave the house alone, but does not go out frequently. (*Id.* at 211) Rogers noted that her daughter often buys groceries for her, but she does accompany her daughter to the store at times. (*Id.*) She said she is able to manage her own

---

[2] Sepsis is the destruction or infection of tissues by disease-causing organisms, usually accompanied by a fever. HARVARD HEALTH PUBLICATIONS: HARVARD MEDICAL SCHOOL, http://www.health.harvard.edu/medical-dictionary-of-health-terms/ (last visited Aug. 4, 2017).

financial affairs. (*Id.*) Rogers said she does spend time with others, but that it has become more difficult for her to leave the house for social purposes. (*Id.* at 212–213) Rogers noted that she is able to follow written and spoken instructions "pretty well" depending on how she feels at the time. (*Id.* at 213)

In May 2012, disability expert, Paul Taren, Ph.D., conducted an evaluation and prepared a report for the purpose of Rogers' disability determination. (*Id.* at 93–99) Dr. Taren conducted a psychiatric review technique (PRT). (*Id.* at 97) Dr. Taren concluded that Rogers was not disabled due to "insufficient evidence" to evaluate the limitations under the "paragraph B" criteria of the listings. (*Id.* at 97)

On September 13, 2012, Rogers received a warning letter from Dr. Howard Arian, her pain management doctor, due to Rogers receiving narcotics from another doctor. (*Id.* at 1045) The letter concluded that Rogers would be discharged from Dr. Arian's care if she did not comply with the warning letter. (*Id.*)

On November 19, 2012, Rogers sought treatment at Kent General Hospital due to abdominal pain and vomiting. (*Id.* at 1004–1015) Dr. David Zamara noted that Rogers was "alert, oriented, and fully verbal." (*Id.* at 1005) Dr. Zamara stated that Rogers' mood and effect was normal. (*Id.* at 1008) Rogers was diagnosed with nausea with vomiting and chronic abdominal pain. (*Id.*)

In January 2013, a second disability expert, Christopher King, Psy.D., conducted an evaluation and prepared a report for the purpose of Rogers' disability determination. (*Id.* at 108–109) Dr. King noted that Rogers states she has problems concentrating and getting along with others, and was recently hospitalized with delusions secondary to intense pain. (*Id.* at 108) However, Dr. King stated that Rogers' statements were not entirely credible. (*Id.*) He concluded

that Rogers does not have a history of formal mental health treatment, and exhibits no indication of a diagnosable depressive disorder. (*Id.*) However, he noted that Rogers' records reflect a history of anxiety symptoms. (*Id.*) Dr. King stated there is no evidence of any appreciable deficits in concentration or social functioning. (*Id.* at 109) Dr. King concluded that Rogers has a non-severe mental impairment. (*Id.*)

On June 25, 2013, Rogers sought treatment at Nanticoke Memorial Hospital for an "altered mental status" due to a seizure possibly related to a sudden discontinuing of pain medication. (*Id.* at 1118) A CT scan of the brain showed no acute abnormalities and no major abnormalities. (*Id.* at 1119) Rogers was prescribed Dilantin and benzodiazepine, as needed, for the treatment of seizures and anxiety. (*Id.*)

In July 2013, Rogers sought treatment at Kent General Hospital for severe nausea, vomiting, and abdominal pain. (*Id.* at 1118) After four days at the hospital, on July 11, 2013, Rogers was transferred to Dover Behavioral Services ("DBS") for suicidal ideations. (*Id.* at 1090) Rogers tested positive for cocaine and opiates, and had a GAF score of 20[3] at the time of

---

[3] The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association. *Robinson v. Colvin*, Civ. No. 14-662-SLR, 2015 WL 5838469, at *4 n.9 (D. Del. Oct. 5, 2015) (citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM-IV-TR*)). A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work ...)." *Id.* A GAF of 41-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.* A GAF of 61-70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning ..., but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

her arrival. (*Id*. at 1088) She was discharged on July 18, 2013, with a diagnosis of major depressive disorder, and a GAF score of 55. (*Id.*) At the time of discharge, Dr. Anil Meesala noted that Rogers was stable, and was prescribed antidepressant medication. (*Id.* at 1089)

On July 24, 2013, Rogers was readmitted to DBS for suicidal ideations. (*Id.* at 1093–1099) At the time of her admission, Rogers had a GAF score of 40, and tested positive for drugs including barbiturates and oxycodone. (*Id.* at 1093–1098) The nurse practitioner noted that Rogers had recently found out that her cousin had been shot and killed. (*Id.* at 1094) Rogers was discharged on August 6, 2013, with a diagnosis of major depressive disorder, and with an unknown GAF score. (*Id.* at 1093) Rogers was also assigned to group and family therapy sessions through Recovery Innovations. (*Id.* at 1098)

On August 11, 2013, Rogers was readmitted to DBS for suicidal ideations. (*Id.* at 1100– 1104) At the time of her admission, Rogers had a GAF score of 25. (*Id.* at 1103) Rogers was discharged on August 21, 2013, with a diagnosis of major depressive disorder, and a GAF score of 50. (*Id.* at 1100)

On August 29, 2013, Rogers was readmitted to DBS for suicidal ideations and worsening of depressive symptoms. (*Id.* at 1103–1109) At the time of her admission, Rogers had a GAF score of 30. (*Id.* at 1109) Dr. Meesala noted that Rogers benefitted from both group and family therapy sessions, and noticed an improvement in Rogers' overall mood. (*Id.* at 1106) Rogers was discharged on September 19, 2013, with a diagnosis of a mood disorder, and a GAF score of 60. (*Id.* at 1100)

On September 3, 2013, Rogers received a letter from Dr. Arian stating Rogers was discharged as a patient, and was no longer allowed on the premises, because she received

6

controlled substances from multiple physicians from September 4, 2012 through August 22, 2013. (*Id.* at 1453)  However, Dr. Arian would later re-accept Rogers as a patient.[4]

On September 24, 2013, Rogers was admitted to DBS for ongoing depressive issues. (*Id.* at 1115–1116)  Rogers was discharged to a Partial Hospitalization Program ("PHP") on September 27, 2013, with a diagnosis of a mood disorder, and a GAF score of 25. (*Id.* at 1115)  On October 17, 2013, Rogers was discharged from the PHP with a diagnosis of a mood disorder and a GAF score of 50. (*Id.* at 1110)  At the time of her discharge, Rogers was given a follow-up appointment with nurse practitioner, Alma Surratt, and was signed up for an individual therapy appointment. (*Id.* at 1111)

On October 31, 2013, Rogers began treatment at ABR Counseling Associates of Kent County ("ABR"). (*Id.* at 1242–1244)  At ABR, Rogers was diagnosed with bipolar disorder. (*Id.*)  Rogers was prescribed Xanax, Lamictal, and Ambien. (*Id.*)

On March 18, 2014, Dr. Arian completed an evaluation of Rogers' physical and mental well-being. (*Id.* at 1558–1561)  Dr. Arian diagnosed Rogers with lumbago[5], and stated her symptoms would likely last 12 months. (*Id.*)  He stated that emotional factors contribute to the severity of Rogers' symptoms and physical limitations. (*Id.*)  Dr. Arian noted that depression affects Rogers' symptoms, however, he noted that he is "not an expert in psychological diagnosis." (*Id.* at 1559)  Dr. Arian further noted that Rogers' symptoms would impact her attention and concentration, causing her to be off-task for 20% of the workday. (*Id.* at 1561)  Dr. Arian opined that Rogers would probably miss about two days of work per month due to her

---

[4] In a statement dated May 15, 2014, Rogers stated she continues to have a "good working relationship" with Dr. Arian. (Tr. at 241)

[5] Lumbago is acute or chronic pain in the lower back. MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/lumbago (last visited Aug. 4, 2017).

7

impairments. (*Id.*) He stated that Rogers is capable of handling "moderate stress" in the workplace. (*Id.*) He concluded that Rogers manifests an "undefined psychological disturbance." (*Id.*)

On May 15, 2014, Connections Community Support Programs provided Rogers with a case management service provider to coordinate her care with medical and mental health professionals, for the purpose of reducing her emergency room usage. (*Id.* at 245)

### C.    Hearing Before the ALJ

#### 1. Rogers' testimony

Rogers testified that she became unable to work in 2008, because she physically could no longer do the work required. (Tr. at 62–63) She stated that her inability to focus limits her capability to work the most. (*Id.*) She explained that her ability to concentrate is terrible, and she sometimes forgets to take her medication. (*Id.* at 69) Rogers explained that she has been diagnosed with severe mental depression and bipolar disorder. (*Id.* at 63) Rogers stated that she tried to commit suicide eight or nine years ago. (*Id.*) In July of 2013, Rogers said she struggled with drug and alcohol abuse. (*Id.* at 65) She testified that she no longer uses illegal drugs. (*Id.* at 72) Rogers stated that she has been receiving counseling services since October 2013. (*Id.* at 66) Rogers stated that she takes eleven different medications. (*Id.* at 70) She said the therapy has not made her feel better mentally. (*Id.* at 67) Rogers said she becomes angry at herself at times, has paranoid thoughts, and experiences mood swings. (*Id.* at 70–71) Rogers said she sometimes thinks she is hearing voices. (*Id.* at 71) Rogers explained that she also has problems sleeping. (*Id.*)

Rogers explained that she also has lower back pain ever since she slipped and fell a few years ago. (*Id.* at 75) Rogers said she received an injection in her back in 2013. (*Id.*) Rogers

explained that she currently receives physical therapy for her back. (*Id.* at 76) Rogers said she takes ten milligrams of Oxycodone and uses a Fentanyl patch for her back pain. (*Id.*) She said her back hurts when she sits, stands, and walks. (*Id.* at 77) Rogers said she also has nerve damage in her leg. (*Id.*) Rogers testified that she gets seizures, and takes medication for them. (*Id.* at 78–79) Rogers also explained that she has really serious acid reflux, and takes medication for the symptoms. (*Id.* at 72–73) In 2011, Rogers explained that she had a biopsy on her lungs, and now uses an inhaler. (*Id.* at 74) She explained that she uses the inhaler frequently. (*Id.* at 75)

Rogers testified that she could probably stand between 15 and 30 minutes at a time. (*Id.* at 81) She explained that she has a hard time sitting down. (*Id.*) Rogers testified that her pain management specialist said she should not lift more than ten pounds at a time. (*Id.* at 82) Rogers explained that if she drops something, she often has someone else pick up the item for her. (*Id.*) Rogers said her ability to take care of her personal hygiene depends on how she feels at the time. (*Id.* at 83) She said she sometimes makes her own meals. (*Id.*) She testified that she does not make her bed or change the bed sheets, so she just lays on top of her bed. (*Id.*) Rogers explained that her daughter does her laundry most of the time. (*Id.* at 84) Rogers stated her daughters or her case manager will drive her to the grocery store to get food. (*Id.*)

Rogers also explained that she was a social person years ago, but she no longer likes to be around a lot of people. (*Id.* at 68, 85) Rogers said that she and her family are currently distant. (*Id.*) However, Rogers said that she talks to her father on the phone. (*Id.* at 69) Rogers testified that she currently lives in a mental health house, and receives individual therapy. (*Id.* at 68) She said she often has panic or anxiety attacks about dying. (*Id.* at 72)

### 2. Vocational expert testimony

The ALJ posed the following hypothetical to the vocational expert (the "VE"):

[T]his is an individual who is aged 39, the claimant's age at the application year; has a high school degree, can read, write and do simple math. The hypothetical is for the light level of exertion. The postural are all occasional, but no [sic] climb a ladder, a rope or scaffold. Environmentally avoid concentrated exposure to temperature extremes, fumes, odors, dust, gases, poor ventilation and hazards. Hazards are defined as heights and moving machinery. Finally simple, unskilled work. Could such a person do any of the past work?

(*Id.* at 87–88)

Based on the VE's testimony and Rogers' medical history, the ALJ concluded that Rogers was unable to return to her past relevant work.[6] (Tr. at 39) However, the VE testified that at the light exertional level, the individual described would be able to work in occupations including price marker, packer, or production inspector. (*Id.* at 88–89) The VE testified that at the sedentary exertional level, the individual described would be able to work in occupations including grader, sorter, information clerk, or order clerk. (*Id.* at 88–89)

On cross examination, Rogers' attorney asked whether a hypothetical individual who is limited to "sitting less than two hours, standing or walking less than two hours" could perform the work listed by the VE. (*Id.* at 88) The VE stated that such a hypothetical is not representative of full time work. (*Id.*) Rogers' attorney further asked whether someone who has symptoms that "interfere with the person's attention and concentration for at least twenty percent of the workday" could perform the work listed by the VE. (*Id.*) The VE responded that such an individual would not be "sufficiently productive to be sustained in work." (*Id.*)

### 3. The ALJ's findings

Based on the factual and medical evidence in the record, and the testimony of Rogers and the VE, the ALJ determined that Rogers was not disabled under the Act for the relevant time

---

[6] The court notes that the ALJ asked the VE if Rogers could return to her past relevant work, however, the VE's response is written as "inaudible" on the transcript. (Tr. at 880)

period from July 20, 2011 through the date of the ALJ's decision, June 25, 2014. (Tr. at 27–41)

The ALJ found, in pertinent part:

1. The claimant has not engaged in substantial gainful activity since July 20, 2011, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: obesity; lumbar degenerative disc disease; depression; anxiety; and history of substance abuse (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except postural activities are all occasional, but no climbing of a ladder, rope, or scaffold. Environmentally, avoid concentrated exposure to temperature extremes, odors, dust, gases, poor ventilation, and hazards, defined as heights and moving machinery. She is limited to simple, unskilled work.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on July 5, 1972 and was 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 20, 2011, the date the application was filed (20 CFR 416.920(g)).

(Tr. at 32–40)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190–91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the United States Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250–51 (internal citations omitted). Thus, in the context of judicial review under § 405(g):

> [a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 826 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

13

## IV.   DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." 42 U.S.C. § 423(a)(1)(D) (2015); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *Id.* § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21–22 (2003).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to

a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

**B.    Whether the ALJ's Decision is Supported by Substantial Evidence**

On June 25, 2014, the ALJ found Rogers was not disabled within the meaning of the Act

from July 20, 2011, the date the application was filed, through the date of the hearing. (Tr. at 30–

41)  The ALJ concluded that, despite Rogers' severe impairments (obesity, lumbar degenerative

disc disease, depression, anxiety, and a history of substance abuse), she has the residual

functional capacity to perform light work. (*Id.*)  After considering the VE's testimony, the ALJ

concluded that Rogers could work as a ticket marker, packer, production inspector, grader,

sorter, information clerk, or order clerk. (*Id.* at 40)

Rogers asserts three arguments on appeal: (1) the ALJ failed to evaluate Rogers' mental

impairments at Step Three; (2) the ALJ improperly discounted Rogers' treating physician's

opinions; and (3) the ALJ erred in not addressing all of Rogers' GAF scores. (D.I. 13, 16)

### 1.  The ALJ properly conducted an assessment of Rogers' mental impairments at Step Three

Rogers contends the ALJ did not consider all of the evidence when evaluating the

severity of her mental impairments at Step Three. (D.I. 16 at 12–16)  Specifically, Rogers alleges

the ALJ erred in failing to include opinions from her treating physician in determining whether

her symptoms satisfied the criteria for listings 12.04 (defining "depressive, bipolar and related

disorders"), 12.06 (defining "anxiety and obsessive-compulsive disorders"), and 12.09 (defining

"substance addiction disorders"). (*Id.*)

To reach her conclusion that Rogers' impairments did not meet the criteria of listings at

Step Three, the ALJ assessed the four functional areas set out in the disability regulations for

evaluating mental disorders, known as the "paragraph B" criteria. *See* 20 C.F.R. § 404, Subpt. P,

App. 1 (2015).  These areas include activities of daily living; social functioning; concentration,

persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404, Subpt. P, App. 1, at §

12.00(C). To find a marked rather than mild limitation in one of these areas, the impairment must be more than moderate, but less than extreme, and the limitation must seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis. *Id.* To satisfy the "paragraph B" criteria for a listing, the mental impairments must be marked in at least two of the above categories. (Tr. at 34)

First, with respect to activities of daily living, the ALJ found that Rogers has a mild restriction. (*Id.* at 34) "[A]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. § 404, Subpt. P, App. 1, at § 12.00(C)(1). Rogers argues the ALJ did not consider that she has a hard time putting on shoes, and that her daughter helps her with her hair. (D.I. 16 at 14) The ALJ, however, based her finding primarily upon Rogers' own testimony. In her testimony, Rogers stated she can put together a meal for herself, and is able to take care of her personal hygiene. (Tr. at 83–84) Rogers stated her daughter helps her with laundry, and will drive her to the grocery store to get food. (*Id.*) The ALJ also relied upon an Adult Function Report that Rogers filled out in 2012. In the report, Rogers stated she can perform light dishwashing, and fold laundry while sitting down. (*Id.* at 209–211) Accordingly, substantial evidence supports the ALJ's conclusion that Rogers did not exhibit marked restriction in activities of daily living.

Second, the ALJ found a mild restriction in social functioning. (*Id.* at 12) Initiating social contact with others, communicating clearly with others, or interacting and actively participating in group activities are indicative of strength in social functioning. *See* 20 C.F.R. § 404, Subpt. P, App. 1, at § 12.00(C)(2) (2015). Rogers argues the ALJ did not consider her

17

decreased participation in social activities because of her pain and anxiety, and that she is emotionally distant from friends and family. (D.I. 16 at 14)  The ALJ, however, based her finding primarily upon Rogers' own testimony.  Rogers testified that she goes to the grocery store with her daughter, and talks to her father on the telephone. (*Id.* at 69–84)  Rogers also testified to having roommates. (*Id.* at 68–72)  In the Adult Function Report, Rogers stated she is able to leave the house alone, but does not go out frequently. (*Id.* at 211)  Accordingly, substantial evidence supports the ALJ's conclusion that Rogers did not exhibit marked restriction in social functioning.

Third, the ALJ found that Rogers has moderate difficulties in the functional area of concentration, persistence, or pace. (*Id.* at 34)  Rogers argues that the ALJ did not consider her inability to finish things or her ability to handle stress. (D.I. 16 at 14)  However, the ALJ did address Rogers' testimony in which she stated she has difficulty focusing and maintaining concentration. (Tr. at 34)  The ALJ further noted that Rogers testified to taking her medication on her own, but that she does forget to take doses at times. (*Id.*)  Moreover, Rogers testified that she is able to maintain her own finances. (*Id.* at 211)  Rogers further argues the ALJ did not consider Dr. Arian's opinion, in which he checked a box indicating that Rogers would be off task 20% of the workday, and would miss two days of work a month. (D.I. 16 at 15)  The ALJ did not mention Dr. Arian's opinion when analyzing Rogers' mental impairments under the criteria of "paragraph B" for Step Three, however, the ALJ did consider Dr. Arian's opinion at Step Four, when conducting a residual functional capacity assessment. (Tr. at 39)  Nonetheless, substantial evidence supports the ALJ's conclusion that Rogers did not exhibit marked restriction in concentration, persistence or pace.

Finally, the ALJ found one to two episodes of decompensation of extended duration during the relevant time period. (*Id.* at 34) To qualify, there must be "three episodes in 1 year, or an average of once every four months, each lasting two weeks."[7] 20 C.F.R. § 404, Subpt. P, App. 1 (2016). Rogers argues the ALJ did not consider her six hospital admissions between July 2013 and October 2013, including three admissions that exceeded two weeks. (D.I. 16 at 15) However, the ALJ does acknowledge that Rogers had two episodes of decompensation, and had inpatient mental health treatment in July 2013. (Tr. at 34) Additionally, Rogers claims a disability onset date of May 1, 2010. (Tr. at 30) However, she admits not seeking any treatment for mental health issues until July of 2013. (Tr. at 108, 1118) In the interim, she admits she had not worked at all and was abusing drugs and alcohol in place of treatment. (Tr. at 36, 108, 1088) Thus, substantial evidence exists for the ALJ's finding that the "paragraph B" criteria were not met.

The ALJ further considered whether "paragraph C"[8] criteria was satisfied. (*Id.* at 35) The ALJ noted:

> There is no evidence that the claimant has had repeated episodes of
> decompensation, or that minimal increases in mental demands or a change in the
> environment would cause her to decompensate, or that she has the inability to

---

[7] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." 20 C.F.R. § 404, Subpt. P, App. 1 (2016).

[8] A "paragraph C" analysis is only conducted if the "paragraph B" criteria is not met. CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). A "paragraph C" analysis is conducted for listings 12.04 and 12.06. *Id.* The "paragraph C" criteria considers the severity of the functional limitations. *Id.*

19

function outside of a highly supportive living arrangement or a complete inability
to function independently outside the area of her home.

(Tr. at 35)

Although Rogers experienced episodes of decompensation, it is not enough to satisfy the
requirements of listings 12.04, 12.06, and 12.09 as determined by the "paragraph B" criteria. As
the ALJ stated: "Because the claimant's impairments do not cause at least two 'marked'
limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of
extended duration, the 'paragraph B' criteria are not satisfied." (Tr. at 34) As such, substantial
evidence supports the ALJ's assessment of Rogers' mental impairments at Step Three of the
evaluation process.

## 2. The ALJ properly weighed the objective medical evidence and opinions of Rogers' treating physician

Rogers argues the ALJ failed to properly weigh the medical opinions of her pain
management specialist, Dr. Arian. (D.I. 13 at 17–18) Rogers asserts the ALJ improperly gave
Dr. Arian's opinion "little weight," because his opinion was supported by all of the medical
evidence and her testimony. (D.I. 16 at 10–12) Rogers further argues the ALJ's findings are
improperly based on her own lay opinion. (D.I. 13 at 14–15)

To determine the proper weight to give to a medical opinion, the ALJ is required to
weigh all the evidence and resolve any material conflicts. *See Richardson v. Perales*, 402 U.S.
389, 399 (1971). Generally, the weight afforded to any medical opinion is dependent on a
variety of factors, including the degree to which the opinion is supported by relevant evidence
and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)–(4) (2012). To that end,
the more consistent an opinion is with the record as a whole, the more weight is given to that
opinion. *Id.* § 404.1527(c)(4).

20

The ALJ must first assess whether a medical opinion is from a treating, non-treating, or non-examining source. 20 C.F.R. §§ 404.1502, 416.902; *see also Fletcher v. Colvin*, Civil Action No. 12-920-SRF, 2015 WL 602852, at *9 (D. Del. Feb. 11, 2015), *report and recommendation adopted*, 2015 WL 1284391 (D. Del. Mar. 19, 2015). The opinion of a treating physician—one who has an "ongoing treatment relationship" with the patient—is entitled to special significance. 20 C.F.R. §404.1502; *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). On the other hand, a treating physician's opinion does not warrant controlling weight if unsupported by clinical and laboratory diagnostic findings, and if it is inconsistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Fargnoli*, 247 F.3d at 42–43. The more a treating source presents medical signs and laboratory findings to support the medical opinion, the more weight it is given. *See Robinson v. Colvin*, Civ. No. 14-662-SLR, 2015 WL 5838469, at *12 (D. Del. Oct. 5, 2015). Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.*

An ALJ may not reject a treating physician's assessment based on his or her own credibility judgments, speculation, or lay opinion, and the ALJ cannot disregard a treating physician's opinion without explaining his or her reasoning or referencing objective conflicting medical evidence. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). Even when the treating source opinion is not afforded controlling weight, the ALJ must determine how much weight to assign it by considering factors such as length, nature, and frequency of treatment visits, nature and extent of the treatment relationship, whether the opinion is supported by medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization. 20 C.F.R. §§ 404.1527(d), 416.927(d).

In the present case, Dr. Arian provided a report on Rogers' physical and mental limitations, in which Dr. Arian checked a box stating Rogers would be off task for 20% of the workday, and would be absent from work two days per month. (Tr. at 1558–1561) However, the ALJ assigned Dr. Arian's opinion "little weight," because objective medical findings, and conservative and routine treatment history, did not support the limitations assessed. (*Id.* at 39) For example, Dr. Arian, throughout his treatment of Rogers, consistently stated that Rogers' attention span and ability to concentrate was normal. (*Id.* at 1406, 1408, 1513, 1517, 1521, 1525) Dr. Arian also stated that Rogers' prognosis was "good" for the treatment of her lumbago. (*Id.* at 1245) The ALJ further noted that Dr. Arian's records show that Rogers' treatment remains limited to medication and physical therapy. (*Id.* at 39) Dr. Arian concluded that Rogers had an "undefined psychological disturbance." (*Id.* at 1561) However, Dr. Arian noted in his evaluation of Rogers that he is not "an expert in psychological diagnosis." (*Id.* at 1559) Moreover, the Third Circuit has explained that form reports which require physicians to only check boxes or fill in a blank are considered "weak evidence at best," especially when such reports are not accompanied by written explanations. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). Therefore, substantial evidence supports the ALJ's decision to assign less than controlling weight to the opinion of Dr. Arian.

Rogers further argues the ALJ improperly relied on her own lay opinion. (D.I. 16 at 9–12) Rogers' argument is flawed. In her analysis, the ALJ assigns little weight to Dr. Arian's opinion that Rogers would be off task for 20% of the workday, but does address Dr. Arian's other findings. For example, the ALJ considered Dr. Arian's opinions as to Rogers' prognosis and future treatment, gait, and pain management. (*Id.* at 37–39) Moreover, an ALJ does not have to accept the opinion of any medical doctor or expert, but may weigh the evidence in the record

and make her own inferences. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) (citing *Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986) ("The ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw its own inferences."). As such, the court finds the ALJ did not improperly rely on her own lay opinion.

### 3. The ALJ appropriately considered Rogers' GAF scores

Rogers argues the ALJ erred in not considering her GAF scores fluctuating from 20 to 60 during her various hospital treatments in 2013, when determining the severity of her mental impairments. (D.I. 13 at 15–17)

In her analysis, the ALJ acknowledged Rogers' inpatient treatment at DBS, in which she was discharged with a GAF score of 55. (Tr. at 39) The ALJ did not address Rogers' subsequent GAF scores. However, the ALJ did explain how the GAF score of 55 was consistent with the medical record as a whole. (Tr. at 39) For example, the ALJ stated that a GAF score of 55 is consistent with "the limited mental health treatment record, improvement of symptoms with alcohol and drug abstinence, and reports of some difficulty with memory." (*Id.*) Additionally, the ALJ cited to Rogers' reported activities of daily living. (*Id.*) The ALJ further noted that Rogers did not seek formal mental health treatment until 2013, and appears stable under her current treatment plan. (*Id.* at 38) The ALJ also considered Rogers' alcohol and drug use. (*Id.*) The ALJ noted that substance abuse may reduce the effectiveness of prescribed medications.[9] (*Id.* at 38)

---

[9] The Social Security Act states that "an individual shall not be considered to be disabled...if alcoholism or drug addiction would be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(a)(3)(J).

Moreover, it is not a requirement for the ALJ to discuss all of the GAF scores in the medical record. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). The ALJ discussed Rogers' inpatient treatment at DBS and her GAF score of 55, and explained how the record as a whole did not support a finding of disability. (Tr. at 36–39) Moreover, the ALJ cited to substantial evidence in the record that contradicts limitations that would be indicated by low GAF scores. *See Axtell v. Colvin*, 2015 WL 12781187, at *19 (D. Minn. Apr. 30, 2015) ("The ALJ's treatment of the GAF scores was adequate and the ALJ gave ample support for his decision that the low scores did not support an inability by [Plaintiff] to work."). As such, substantial evidence supports the ALJ's consideration of Rogers' GAF scores.

### 4. Substantial evidence supports the ALJ's assessment of Rogers' mental impairments

Rogers argues the ALJ failed to evaluate the severity of her mental impairments. (D.I. 13 at 14) However, Rogers' argument is not persuasive, because the ALJ concluded that Rogers has severe depression and anxiety. (Tr. at 32) The ALJ rejected the opinions of two State agency psychological consultants that found Rogers' mental impairments to be "non-severe," because the ALJ found that Rogers' ongoing treatment and recent hospitalizations supported a finding of severe depression and anxiety. (*Id.* at 38)

The ALJ found that Rogers' mental impairments did not meet or equal the requirements of one of the Commissioner's listed impairments. *See* § IV(B)(1), *supra*. Nonetheless, the ALJ considered such impairments in the determination of Rogers' RFC.

The ALJ concluded that despite Rogers' severe mental impairments, Rogers' RFC is consistent with being able to perform "a full range of light work." (*Id.* at 40) The ALJ noted that

Rogers "appears stable with current treatment." (*Id.* at 38) The ALJ further limited Rogers to "simple unskilled work," due to her reported difficulty with memory and focus. (*Id.*) However, "a finding of a severe impairment does not automatically lead to the inclusion of limitations resulting from the severe impairment in the RFC assessment." *Kelly v. Colvin*, 2013 WL 5273814, at *11 (D. Del. Sept. 18, 2013). Rogers does not take issue with the ALJ's finding at Step Four that she cannot perform her past relevant work.

The ALJ concluded Rogers could perform a variety of jobs, as suggested by the VE. (*Id.* at 40) The VE stated that Rogers could perform the requirements of representative light, unskilled jobs, such as ticket marker (1.5 million jobs nationally and 1,400 locally), packer (300,000 jobs nationally and 200 locally), and production inspector (660,000 jobs nationally and 9,000 locally). (*Id.* at 40) The VE further stated that Rogers could perform the requirements of representative sedentary unskilled jobs, such as grader sorter (39,000 jobs nationally and 260 locally), information clerk (47,000 jobs nationally and 200 locally), and order clerk (200,000 jobs nationally and 300 locally). (*Id.*) Thus, substantial evidence supports the ALJ's consideration of Rogers' mental impairments.

## V.    CONCLUSION

For the foregoing reasons, the court recommends denying Rogers' motion for summary judgment (D.I. 12), and granting the Commissioner's cross-motion for summary judgment (D.I. 14).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10)

pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: August 28 , 2017

Sherry R. Fallon
United States Magistrate Judge